# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7651 | **DATE** | 3/17/2004 |
| **CASE TITLE** | Christine Hansen vs. Delta Airlines | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Delta's motion to dismiss (13-1) is denied. Delta is directed to file its answer within 21 days. Rule 16 conference set for April 14, 2004, at 9:00 a.m. Parties are encouraged to discuss settlement.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 18 2004 date docketed | 21 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | IS docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | | 3/16/2004 date mailed notice | |
| ETV | courtroom deputy's initials | 2004 MAR 17 PM 1:44 Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 18 2004

CHRISTINE HANSEN, )
)
Plaintiff, )
)
v. ) No. 02 C 7651
)
DELTA AIRLINES, a corporation, ) Judge Rebecca R. Pallmeyer
)
Defendant. )

### MEMORANDUM OPINION AND ORDER

Plaintiff Christine Hansen ("Hansen") filed this action against Defendant Delta Airlines ("Delta") seeking redress under Illinois law for false imprisonment, malicious prosecution, and intentional infliction of emotional distress. Hansen was arrested by officers of the Chicago Police Department at O'Hare Airport, where she had intended to board a Delta flight with a final destination of Manchester, England. Hansen initially filed her complaint in the Circuit Court of Cook County, Illinois, and Delta removed to this court.[1] Thereafter, Hansen filed an Amended Complaint with this court.

Delta now moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, Delta asserts that Hansen's state law claims are preempted by (1) the Warsaw Convention, 49 Stat. 3000 (reprinted in 49 U.S.C. § 40105), and (2) the air carrier immunity provisions of the Aviation and Transportation Security Act, 49 U.S.C. § 44941, and the Federal Aviation Act, 49 U.S.C. § 44902(b). For the reasons set forth below, Delta's motion is denied.

---

[1] Plaintiff claims that 28 U.S.C. §§ 1332 and § 1367(a) provide jurisdiction over her claims, all of which are based in state law, as Hansen is a citizen and resident of Illinois and Delta is a Delaware corporation with its principal place of business in Georgia. Plaintiff also alleges the amount in controversy exceeds $100,000. (Amended Complaint ¶¶ 4-5.)

## FACTUAL BACKGROUND

According to the Amended Complaint, on January 7, 2002, Defendant Delta Airlines issued Plaintiff Hansen a round-trip ticket for travel from Chicago, Illinois, to her final destination of Manchester, England. (Amended Complaint ("Am. Compl.") ¶ 7.) The first leg of Plaintiff's trip was to be on Delta Flight No. 555, scheduled to depart from O'Hare Airport in Chicago, Illinois ("O'Hare"), on January 15, 2002. (*Id.* ¶ 8.)[2] On that day, Plaintiff and her husband, James Bottomley ("Bottomley"), approached the first-class Delta ticketing counter at O'Hare, (*id.* ¶ 9), and received their boarding passes from the ticketing agents at the check-in counter. (*Id.* ¶ 10.) Plaintiff asserts that she cooperated with all of the requests and questions of Delta's employees. (*Id.* ¶ 11.) "[A]t some point after" Plaintiff and Bottomley left the first-class counter, a Delta employee told the authorities that Plaintiff had uttered the word "bomb"; Plaintiff denies that she said that word. (*Id.* ¶ 12.) Delta employee Teresa Moloney ("Moloney") signed a complaint on behalf of Delta, in which she accused Plaintiff of committing "the offense of disorderly conduct." (*Id.* ¶ 13.) Specifically, Moloney alleged that Plaintiff "[s]tated the word 'bomb' during a conversation with [Moloney] who is an agent for Delta Airlines as the agent asked . . . [Hansen] security question [sic]. This action put people in the area in fear for their safety." (Ex. B to Am. Compl.)

As Plaintiff and Bottomley "reached the boarding line for flight 555," two uniformed Chicago Police Department officers detained Plaintiff. (Am. Compl. ¶ 14.) Plaintiff was handcuffed, escorted to a police van, and transported to a Chicago Police station. (*Id.* ¶ 15.) At the police station, a Chicago Police officer performed a body search of Plaintiff, handcuffed her to a jail cell, and photographed and fingerprinted her. (*Id.* ¶ 16.) Plaintiff was released on bail the following day.

---

[2] Plaintiff's ticket indicates that on January 15, 2002 she was to travel on Delta Flight No. 555 from Chicago, Illinois, to Atlanta, Georgia, where she was to board Delta Flight No. 64 to Manchester, England, returning on Jan. 20, 2002. (Ex. A to Plaintiff's Response to Defendant's Motion to Dismiss.)

(*Id.* ¶ 17.) At her March 15, 2002 criminal hearing, all charges against Plaintiff were dropped due to lack of prosecution. (*Id.* ¶ 18.)

In Count I of her Amended Complaint, Plaintiff asserts that Delta's actions resulted in her false imprisonment, (*id.* ¶ 19), and that Delta's actions were intentional, willful, wanton, and done with reckless disregard for Plaintiff's rights and without any basis in fact. (*Id.* ¶ 20.) In Count II, Plaintiff alleges that Delta's actions constituted malicious prosecution, (*id.* ¶ 23), and that Delta did not have probable cause for its actions. (*Id.* ¶ 24.) In Count III, Plaintiff claims that Delta's actions constituted intentional infliction of emotional distress, (*id.* ¶ 27), and that Delta's actions were extreme and outrageous, (*id.* ¶ 29), as well as intentional, willful, wanton, and done with reckless disregard for Plaintiff's rights and without any basis in fact. (*Id.* ¶ 28.)

Plaintiff asserts that she has suffered damages caused by Delta's actions, including, but not limited to: (1) damage to her professional reputation; (2) past and future loss of income; (3) emotional distress; and (4) other economic and consequential damages in an amount in excess of $100,000, plus the cost of this action. (*Id.* ¶¶ 21, 25, 30.)

## DISCUSSION

I.  **Standard of Review**

Delta moves to dismiss Plaintiff's complaint pursuant to FED. R. CIV. P. 12(b)(6). When ruling on a Rule 12(b)(6) motion, the court must accept all well-pleaded allegations in the complaint as true, and must draw all reasonable inferences from the facts in favor of the plaintiff. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). The court may grant such a motion only if there is "no possible interpretation of the complaint" under which the plaintiff can state a claim. *Id.* Delta argues that Plaintiff's state law claims are preempted under the Warsaw Convention (the "Convention") and barred by the air carrier immunity provisions of the Aviation and Transportation Security Act and the Federal Aviation Act. (Defendant's Motion to Dismiss ("Def.'s Motion"), at 1.)

## II. Does the Warsaw Convention Preempt Plaintiff's Claims?

Delta argues that the Convention is Plaintiff's exclusive source of remedy and preempts her state law claims for false imprisonment, malicious prosecution, and intentional infliction of emotional distress. (Def.'s Motion, at 3.) The Convention is a multilateral treaty that governs liability for personal injury and damage to goods during international flight. *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 456 (2d Cir. 2003). As a treaty to which the United States adheres, the Convention is the supreme law of the land and trumps state and local law when it applies. *Commercial Union*, 347 F.3d at 456-57 (citing U.S. CONST. art. II, § 2 & art. VI). The Convention governs "all international transportation of persons, baggage, or goods performed by aircraft for hire." Art. 1(1). Article 17 of the Convention defines the scope of an air carrier's liability for personal injuries to passengers:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Article 17 imposes strict liability on airlines for personal injuries resulting from an accident that occurs "on board [an] aircraft or in the course of any of the operations of embarking or disembarking." *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 552 (1991). Purely mental injuries, unaccompanied by physical injuries, are not compensable under the Convention. *Id.* at 552-53 ("An air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury . . . . [W]e express no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries"); *Ehrlich v. American Airlines*, — F.3d —, 2004 WL 419438, at *18 (2d Cir. Mar. 8, 2004) ("Article 17 . . . permits passengers to hold a carrier liable for a mental injury only to the extent that it was caused by a physical injury").

The Supreme Court has held that "recovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking,' if not allowed under

4

the Convention, is not available at all." *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 161 (1999) (quoting Art. 17, 49 Stat. 3018). Where applicable, the Convention "preclude[s] a passenger from maintaining an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention." *Id.* at 176; *see also Commercial Union*, 347 F.3d at 457.

Plaintiff argues that the Convention does not apply because Plaintiff was not "in the course of any of the operations of embarking" under Article 17. (Plaintiff's Response to Defendant's Motion to Dismiss (hereinafter "Pl.'s Resp. Mem."), at 4-6.) As Plaintiff obviously was neither on board an aircraft nor disembarking from one at the time of her alleged injuries, Article 17 of the Warsaw Convention will govern Plaintiff's claims only if the incident occurred while she was in the course of embarking. *See Kalantar v. Lufthansa German Airlines*, 276 F. Supp. 2d 5, 10 n.6 (D.D.C. 2003). A number of courts, including our Court of Appeals, have identified three factors relevant to determining whether a passenger was engaged in the course of embarking on an international flight: (1) the passenger's location at the time of the injury; (2) the passenger's activity at the time of the injury, and (3) the degree of control the airline was exercising over the passenger when the injury occurred. *Id.* at 10 (collecting cases).[3] The First Circuit noted that "most courts have interpreted the term[ ] 'embarking' . . . to connote a close temporal and spatial relationship with the flight itself." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 316-17 (1st Cir. 1995). The Second Circuit Court of Appeals found that "the drafters of the Warsaw Convention were concerned not just with the location of the passenger, but also with whether the passenger's actions were a part of the process of embarking . . . ." *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33 (2d Cir. 1975). Our

---

[3] The Second and Eleventh Circuits have also recognized a fourth factor, the imminence of final boarding, as part of this inquiry. *See, e.g., Marotte v. American Airlines, Inc.*, 296 F.3d 1255, 1260 (11th Cir. 2002); *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 10 (2d Cir. 1990). As our Court of Appeals has not examined imminence to final boarding, *see Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 617-18 (7th Cir. 1989), and the parties here do not mention it, the court declines to consider this factor.

Court of Appeals has observed that "[t]he delegates of the Warsaw Convention expressly rejected a proposal which would have made an airline liable for all injuries a passenger sustained from the time he first entered the airport of departure until the moment he left the airport of arrival." *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 618 (7th Cir. 1989). On the other hand, it appears that "[o]ne thing that the Warsaw Convention did not mean to do was to grant international air carriers absolute immunity from their negligence inside the terminal." *Beaudet v. British Airways, PLC*, 853 F. Supp. 1062, 1070 (N.D. Ill. 1994).

### A. Cases Finding Passenger was "Embarking" under the Convention

Several courts have found that passengers who were injured in line at the departure gate while waiting to board their flight and were under the direction or control of airline personnel were "embarking" as defined in Article 17 of the Convention. In *Marotte v. American Airlines, Inc.*, 296 F.3d 1255 (11th Cir. 2002), for example, a passenger and his wife appealed the district court's grant of summary judgment on their state law claims in favor of the airline. *Id.* at 1257. The passenger had received his boarding pass, had passed through security, and was in a section of the airport opened only to ticketed passengers but not to the general public. *Id.* at 1258, 1260. As the passenger stepped toward the door to the jetway that led to the airplane, an airline employee ordered that the door be shut and punched or pushed the passenger's chest, causing him to hit the door and fall to the ground. *Id.* at 1258. The employee then kneeled on top of the passenger, grabbed his ticket and boarding pass, tore them up, directed security staff to call the police, and told other airline personnel not to allow plaintiff to board the plane. *Id.* The court found that the plaintiff had satisfied almost all of the conditions precedent to boarding, and that the location of the incident–the door leading to the aircraft the passenger hoped to board–evinced "an extremely close spatial relationship between the attack and the aircraft." *Id.* at 1260. Further, the court found, at the time the incident took place, airline personnel exerted substantial control over the plaintiff: the airline employee had seized plaintiff's ticket and boarding pass and physically prevented him from

6

boarding the aircraft. *Id.* at 1260-61. Affirming summary judgment in favor of the airline on state law claims, the court stated, "It is difficult to imagine a situation that more clearly establishes control than the act of physical restraint." *Id.* at 1261.

The courts in both *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152 (3d Cir. 1977), and *Day* recognized a cause of action under the Warsaw Convention in cases stemming from a terrorist attack on a group of passengers waiting in line at the departure gate to board their flight. At the time of the attack, the passengers had completed almost all of the steps necessary to board the airplane, were in a restricted area of the terminal, and were following the directions of the airline's agents to line up in preparation for passing through a security check point near the entrance to the airplane. *Evangelinos*, 550 F.2d at 153-54; *Day*, 528 F.2d at 32. Both courts found that the passengers were in the course of embarking when their injuries occurred and, thus, that their claims were governed by the Convention.[4]

In *Jefferies v. Trans World Airlines, Inc.*, No. 85 C 9899, 1987 WL 8168 (N.D. Ill. Mar. 17, 1987), the plaintiff fell and was injured when she was joining a line approximately twelve feet from the gate room from which her flight was to depart. *Id.* at *1-2. In reaching the conclusion that plaintiff had a claim under the Warsaw Convention, the court carefully described the concourse for international flights at Heathrow airport, including the physical layout of the corridors, passageways, and moving sidewalks leading to the departure gates. The court concluded that the plaintiff was in the course of embarking when she fell because (1) she "was in the process of completing acts required of her by defendant," (2) she was twelve feet from the gate room, and (3) "her actions were solely related to the purpose of boarding." *Id.* at *2.

---

[4] The *Evangelinos* court reversed the district court's decision granting partial summary judgment in favor of the airline on the plaintiffs' claim that the airline was liable under the Convention. 550 F.2d 153. The *Day* court affirmed the district court's decision granting summary judgment in favor of the plaintiffs on their claim that the defendant was liable under the Convention. 528 F.2d at 38.

7

## B. Cases Finding Passenger was Not "Embarking" under the Convention

Several courts have found that passengers who were injured prior to entering the line to board their flight, were not near the departure gate, and were not under the direction or physical control of airline personnel were not "embarking" as defined in Article 17 of the Convention. In *McCarthy*, the plaintiff and her sister had checked in at the ticket counter in a Tokyo airport for a flight to China shortly before their scheduled flight time. 56 F.3d at 314. The Northwest Airlines agent took their tickets and passports and quickly led the women through the terminal, towards the customs area, to ensure that they made their flight. *Id.* Plaintiff fell when the escalator she was descending, accessible to the general public, malfunctioned. *Id.* In affirming summary judgment for the airline on plaintiff's liability claim under the Convention, the court found that her actions at the time of injury were too remote from the aircraft to constitute "embarking." *Id.* at 318. The court concluded that plaintiff had not fulfilled most of the conditions precedent to boarding, as she had not left the common area of the terminal, she was not under the agent's control, and her activity at the time of her injury—riding an escalator accessible to the general public—was not a prerequisite for boarding. *Id.* at 317-18.

Distinguishing its earlier decision in *Day*, discussed above, the Second Circuit in *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8 (2d Cir. 1990), found that no cause of action under the Convention where a terrorist attack killed a passenger who was still in the main public area. *Id.* at 9. The passenger had already checked his luggage and received his boarding pass, and was walking toward a snack cart in the public area at the time of the attack. *Id.* Affirming summary judgment in favor of the airline on the plaintiff's liability claim under the Convention, the court held that the passenger was not embarking, as he had just begun the process leading to boarding the flight, was still in the public area of the terminal, and was at some distance from the airplane. *Id.* at 10-11.

In *Schroeder*, our Court of Appeals found that a passenger was not in the course of embarking or disembarking when police interrogated her in a building far from the plane. While the plaintiff's flight was en route from Chicago to West Germany, her classmate telephoned the Air Traffic Control Center in Chicago and reported that there was a bomb in the plaintiff's luggage. 875 F.2d at 615. The plane made an emergency landing in Canada, where Canadian police officers removed plaintiff from the plane and searched and interrogated her in a terminal building neither owned nor leased by the defendant airline. *Id.* at 615, 618. In affirming summary judgment for the airline on the plaintiff's liability claim under the Convention,[5] the court found that the police interrogation regarding the bomb was not "even remotely related to a passenger's embarking or disembarking from an airplane." *Id.* Further, the court noted that the airline had no control over the plaintiff or the police while the police detained and searched her. *Id.*[6]

### C. Adequacy of Hansen's Complaint

Delta contends that Plaintiff's "own pleadings clearly establish that based upon the totality of circumstances, Plaintiff was clearly 'embarking,' or 'in the course of any of the operations of embarking,' and thus subject to the parameters of the Warsaw Convention." (Defendant's Reply Brief In Support of its Rule 12(b)(6) Motion to Dismiss ("Def.'s Reply Mem."), at 3.) In support, Delta

---

[5] The *Schroeder* court also affirmed summary judgment for the airline on plaintiff's Illinois tort claims on grounds that were not related to the Warsaw Convention. *See* 875 F.2d at 618-624. As Delta does not argue here that Plaintiff's claims should be dismissed on grounds other than preemption under the Warsaw Convention and two federal statutes, the court need not address the substance of Plaintiff's state law claims.

[6] Delta argues that the factual similarities between *Tseng* and the case at bar are dispositive on the issue of embarking. (Defendant's Reply Brief In Support of its Rule 12(b)(6) Motion to Dismiss, at 3.) The court disagrees. In *Tseng*, in conformity with airline pre-boarding procedures for a flight to Tel-Aviv, an airline security guard questioned a passenger and determined her to be a "high risk." 525 U.S. at 163. The passenger was taken to a private security room where her baggage and person were searched for explosives and detonating devices. *Id.* After the search, the airline personnel determined that the passenger did not pose a security threat and allowed her to board the flight. *Id.* at 164. The passenger later filed suit against the airline alleging a state-law personal injury claim. *Id.* The parties did not dispute that the episode at issue "occurred in international transportation in the course of embarking." *Id.* at 167. Thus, the Court did not address the issue of whether the passenger was "embarking" when the incident occurred.

notes that, at the time of her arrest, Plaintiff had received her boarding pass from the check-in counter, (Am. Compl. ¶ 10), had passed through security, and was detained as she "reached the boarding line" for her flight (*id.* ¶ 14) when the alleged harm occurred. (Def.'s Reply Mem., at 5.) Delta also asserts that Chicago police officers "conducted their independent investigation of Ms. Hansen inside the Delta Air Lines gate area." (Def.'s Reply Mem., at 6.) Thus, according to Delta, "[t]he totality of the circumstances dictates that Delta has substantially satisfied the three relevant factor[s]." (*Id.*) In Delta's view, the fact that Plaintiff had received her boarding pass and the single phrase "as Plaintiff . . . reached the boarding line for flight 555" demonstrate conclusively that Plaintiff was "embarking" within the meaning of Article 17 at the time of her arrest.

Plaintiff asserts that at the time she was arrested, she was "in a location that was neither owned nor controlled" by Delta, as she was walking in the direction of the Delta gate for her flight but had not yet reached the gate area or the boarding line. (Pl.'s Resp. Mem. at 5.) Plaintiff urges further that she was not under Delta's control and had no verbal or physical contact with Delta employees at the time of her arrest, but was free to do as she pleased. (*Id.* at 5-6.)

Drawing all reasonable inferences from the facts in favor of Plaintiff, the court concludes she may be able to demonstrate she was not "in the course of any of the operations of embarking" at the time of her arrest, in light of the three factors relevant to this issue. *See, e.g., Schroeder*, 875 F.2d at 617-18. First, the pleadings do not indicate whether Plaintiff was inside the Delta gate area. Plaintiff's Amended Complaint does not, and indeed need not, identify the precise location—including her distance from the gate—where she was arrested. Second, the complaint does not indicate whether her actions at the time of her arrest were solely related to the act of boarding. While the activity of receiving a boarding pass is obviously one of the steps in the boarding process, at least one court has found this activity "is not sufficiently connected to the actual boarding of the plane to constitute embarking on" an international flight. *Kalantar*, 276 F. Supp. at 12. Third, the pleadings do not describe the extent of Delta's control over Plaintiff at the

time of her arrest. The facts pleaded certainly do not establish that Delta exerted the same degree of control over the plaintiff as the airlines in *Marotte*, *Evangelinos*, and *Day* exercised, and it is not clear from the pleadings whether Delta exerted the same control as the airline in *Jefferies*.

Significantly, Delta points to no cases in which a court has granted a motion to dismiss pursuant to Rule 12(b)(6) where the parties disputed whether the passenger was "embarking" within the meaning of the Convention.[7] Given the fact-intensive nature of this inquiry, it may be rare that sufficient facts are set forth in a pleading to warrant a finding that a passenger was "embarking" under the Convention. This conclusion is entirely consistent with the language of Article 17 which "leaves room for the courts to consider the factual setting of each case." *Jefferies*, 1987 WL 8168, at *4 (citing *Day*, 528 F.2d at 35). Because resolution of this threshold question whether Plaintiff was "embarking" on an international flight requires a fact-intensive inquiry, Delta's motion to dismiss on the basis of the Warsaw Convention must be denied.[8]

## III. Do Federal Air Carrier Immunity Provisions Preempt Plaintiff's Claims?

In the alternative, Delta argues that Plaintiff's state law claims are preempted by the air carrier immunity provisions of the Aviation and Transportation Security Act, 49 U.S.C. § 44941, and the Federal Aviation Act, 49 U.S.C. § 44902(b). The court will address these provisions in turn.

### A. Air Carrier Immunity Under 49 U.S.C. § 44941

Section 44941, titled "Immunity for reporting suspicious activities," provides

---

[7] This court found only two cases in which a district court granted a motion to dismiss a state-law claim on an issue involving the provisions of Article 17 of the Convention. In both cases, however, the "accident" allegedly causing the passenger's injury occurred "on board the aircraft" within the meaning of Article 17. See *Brandt v. American Airlines*, No. C 98-2089 SI, 2000 WL 288393, at *1-2 (N.D. Cal. Mar. 13, 2000) (plaintiff was injured while on board plane when plane's departure was delayed and plane was still at gate); *Tsevas v. Delta Air Lines, Inc.*, No. 97 C 0320, 1997 WL 767278, at *1 (N.D. Ill. Dec. 1, 1997) (plaintiff's injuries occurred during the flight when she was assaulted by an intoxicated passenger seated next to her).

[8] As the court has concluded that the complaint does not, on its face, preclude state law claims, the court need not at this time address Delta's remaining defenses under the Convention, i.e., that Plaintiff's injuries were not the result of an "accident" as defined in Article 17 of the Convention, and that those injuries are not compensable "bodily" injuries.

11

> (a) In general. Any air carrier or foreign air carrier or any employee of an air carrier or foreign air carrier who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism, as defined by section 3077 of title 18, United States Code, to any employee or agent of the Department of Transportation, the Department of Justice, any Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the Unites States, any constitution, law, or regulation of any State or political subdivision of any state, for such disclosure.
> (b) Application. Subsection (a) shall not apply to—
> (1) any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading; or
> (2) any disclosure made with reckless disregard as to the truth or falsity of that disclosure.

Delta argues that Moloney, its employee, engaged in conduct protected under 49 U.S.C. § 44941(a) when she contacted the Chicago police to investigate Plaintiff. (Def.'s Motion, at 10-11.) Plaintiff, on the other hand, argues that Moloney's disclosure to the Chicago police was made with actual knowledge that the disclosure was false, inaccurate, or misleading, or at best with reckless disregard as to the truth or falsity of that disclosure. (Pl.'s Resp. Mem., at 8-9.) Further, in her Amended Complaint, Plaintiff asserts that Moloney's actions were "without any basis in fact." (Am. Compl., ¶¶ 20, 28.) Thus, Plaintiff argues that Delta is not immune for the actions of its employee pursuant to 49 U.S.C. § 44941(b).

Assuming *arguendo* that Moloney's disclosure to the Chicago police was reasonably related to "a threat to aircraft or passenger safety" under 49 U.S.C. § 44941(a), the plain language of 49 U.S.C. § 44941(b) requires this court to determine whether the disclosure was made with "actual knowledge" that it was "false, inaccurate, or misleading," or "made with reckless disregard" as to its truth or falsity as a prerequisite for finding Delta immune from civil liability.[9]

---

[9] This court found only two cases that cite 49 U.S.C. § 44941, neither of which is relevant to this motion. *See Dasrath v. Continental Airlines, Inc.*, 228 F. Supp. 2d 531, 538 (D.N.J. 2002) (finding § 44941 inapplicable to plaintiff's claims, which were based on ultimate decision to remove them from flight, rather than on any communications incidental to such actions); *Bayaa v. United Airlines, Inc.*, 249 F. Supp. 2d 1198, 1205 (C.D. Cal. 2002) (finding § 44941 inapplicable to claims based on actions taken pursuant to disclosure of suspicious activities, rather than on disclosure itself). The court notes that § 44941 was proposed by Senator Leahy as Amendment (continued...)

For purposes of Defendant's motion to dismiss, the court must consider as true Plaintiff's denial that she stated the word "bomb" in her conversation with Moloney. (Compl. ¶ 12.) Delta notes that in Plaintiff's original complaint, filed in the state court action, Plaintiff acknowledged stating, "These security procedures are not going to keep a real terrorist from getting on a plane." (Def.'s Motion, at 2, 10 (citing Original Complaint, Ex. B to Def.'s Motion ¶ 8).) This admission does not appear in Plaintiff's amended complaint, the court many not consider it on this motion to dismiss. See *Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998) (citations omitted) (explaining that facts or admissions in an original complaint not incorporated into an amended pleading are considered *functus officio*, and, as such, "cannot be considered by the court on a motion to dismiss the amended complaint"). The court observes that evidence that Plaintiff made such a statement might well defeat her claims under the air carrier immunity provisions of the Aviation and Transportation Security Act or the Federal Aviation Act, or, at a minimum, could defeat any claim that Moloney's conduct was in bad faith or was capricious or arbitrary. Nevertheless, as there are no facts in the current pleading which reasonably indicate that Plaintiff was "a threat to aircraft or passenger safety," the court concludes Plaintiff may be able to demonstrate that

---

⁹(...continued)
No. 1857 to the Senate version of the Aviation and Transportation Security Act, Pub. L. No. 107-71, § 125, 115 Stat. 597, 631-32 (2001), passed in the aftermath of the events of Sept. 11, 2001, and was adopted by the Senate and the House without changes. In introducing Amendment No. 1857, Senator Leahy made the following remarks:

> The [] amendment provides civil immunity for airlines and airline employees who report information on potential violations of law relating to air piracy, threats to aircraft or passenger safety, or terrorism to the Department of Justice, Department of Transportation, a law enforcement officer, or an airline or airport security officer. This civil immunity would not apply to any disclosure made with actual knowledge that the disclosure was false, inaccurate or misleading or any disclosure made with reckless disregard as to its truth or falsity. In other words, *this amendment would not protect bad actors.*

147 CONG. REC. S10,439-40 (daily ed. Oct. 10, 2001) (statement of Sen. Leahy) (emphasis added). This testimony suggests that Congress did not intend to shield airlines from civil liability for disclosures made in bad faith.

Moloney's disclosure to the Chicago police—which led to Plaintiff's arrest—was made with knowledge of its falsity, inaccurate and misleading, or made with reckless disregard as to its truth.

B. **Air Carrier Immunity Under 49 U.S.C. § 44902(b)**

Delta argues that the decision of its employee Moloney to report Plaintiff's conduct to the Chicago police is protected under 49 U.S.C. § 44902(b) because Moloney had determined in good faith that Plaintiff was "inimical to airline safety." (Def.'s Motion, at 11.) Plaintiff argues that 49 U.S.C. § 44902(b) does not give airline personnel absolute discretion to remove passengers purportedly for safety reasons, and that the decision to deny transportation to a passenger must be rationally based on a concern for safety. (Pl.'s Resp. Mem., at 6.) Plaintiff further argues that Moloney was not acting in good faith and had no rational reason to report to the Chicago police that Plaintiff had uttered the word "bomb." (Id. at 7.)

Section 44902, titled "Refusal to transport passengers and property," provides in relevant part

> (b) Permissive refusal. Subject to regulations of the Under Secretary [of Transportation for Security], an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.

Our Court of Appeals has never construed 49 U.S.C. § 44902(b). Courts in several other circuits, however, have produced insightful opinions this provision. In *Williams v. Trans World Airlines*, 509 F.2d 942 (2d Cir. 1975), the plaintiff, a fugitive who had decided to surrender to the FBI after living abroad for several years, purchased a ticket for a TWA flight from Dar Es Salaam, Tanzania to Detroit via London. *Id.* at 944. While the flight was en route to London, a TWA security representative received information from the FBI that plaintiff was a fugitive, there was a warrant for his arrest, and there was a possibility of a demonstration when he arrived in Detroit. *Id.* The representative requested more information from the FBI, which sent him a copy of the FBI Wanted Bulletin indicating that plaintiff was wanted on a kidnapping charge and was armed and dangerous. *Id.* at 945. The representative informed TWA's President, who decided to refuse the plaintiff

14

passage on any TWA airplanes from London to Detroit. *Id.* In plaintiff's lawsuit challenging this decision under the antidiscrimination provisions of the Federal Aviation Act, the court concluded that TWA had acted within its discretion and had properly refused to transport the plaintiff based on the information it had at the time. *Id.* at 948. Addressing the issue of whether TWA's actions were proper under 49 U.S.C. § 1511, the predecessor to 49 U.S.C. § 44902, the court found that

> [t]he test of whether or not the airline properly exercised its power under [§] 1511 [now § 44902(b)] to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight.

*Id.* at 948.

The Ninth Circuit Court of Appeals adopted the *Williams* test in *Cordero v. Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669 (9th Cir. 1982), in which a passenger was removed from a flight after he became unruly and directed insults at the pilot. *Id.* at 670. The *Cordero* court stated that, although 49 U.S.C. § 44902(b) empowers an air carrier to refuse a passenger transportation, it does not immunize a carrier's unreasonable or irrational decisions. *Id.* at 671. The court further stated that "it is peculiarly within the province of the trier of fact to determine whether the defendant's conduct was reasonable." *Id.* at 672. The court reinstated a jury verdict finding defendant liable for loss of the plaintiff's baggage and for general damages. *Id.*

The district court in *Dasrath v. Continental Airlines, Inc.*, 228 F. Supp. 2d 531 (D.N.J. 2002), also applied the *Williams* test. In *Dasrath*, the plaintiffs, whom the defendant airline perceived as being Arab or Muslim, claimed the airline engaged in unlawful discrimination when it removed them from a flight prior to its departure; the airline moved to dismiss under Rule 12(b)(6). *Id.* at 533-34. The *Dasrath* court noted that "the objective assessment of a carrier's decision must take into account all the circumstances surrounding the decision, including the (perhaps limited) facts known at the time; the time constraints under which the decision was made; and, not least, the general security climate in which the events unfold." *Id.* at 539. The court noted that, at the pleading stage

of the proceedings, "Plaintiffs need only plead, not prove or even offer proof, that [the airline's] conduct was arbitrary and therefore beyond the scope of conduct authorized by § 44902." *Id.* The court denied the airline's motion to dismiss on § 44902 grounds, finding that plaintiffs had sufficiently alleged that the decision to remove them from the flight was the result of intentional racial discrimination and not the result of a rational determination that they were inimical to safety. *Id.* at 539-40.

In *Rubin v. United Airlines, Inc.*, officers of the Los Angeles Police Department removed a passenger from a flight that was about to depart when the passenger refused to take her seat and became abusive. 96 Cal.App.4th 364, 368-70, 117 Cal.Rptr.2d 109, 111-13 (2002). The passenger sued the airline for false arrest, false imprisonment, assault, and battery. *Id.* at 366. In affirming summary judgment in favor of the airline, the court held that under 49 U.S.C. § 44902(b), a passenger whom the airline believes is, or might become, inimical to the safety of the aircraft or its passengers may be ejected from a flight without subjecting the airline for tort liability if airline personnel had a reasonable basis for believing the passenger presented a safety risk. *Id.* at 367. The court acknowledged that, although the discretion given an airline to refuse to transport a passenger is "decidedly expansive, it is not unfettered." *Id.* at 377 (quoting *O'Carroll v. American Airlines, Inc.*, 863 F.2d 11, 12 (5th Cir.1989)). Like the *Williams*, *Cordero*, and *Dasrath* courts, the *Rubin* court stated that the airline's discretion to refuse transport must be exercised in good faith and for a rational reason and cannot be capricious or arbitrary.[10]

---

[10] Defendant also cites *Smith v Comair, Inc.*, 134 F.3d 254 (4th Cir. 1998), where a passenger sued the airline for breach of contract, false imprisonment, and emotional distress after the airline denied him boarding because airline representatives did not ask him for proof of identification before the first leg of his journey, and he was unable to present proper identification prior to the second leg. *Id.* at 256-57. In affirming summary judgment for the airline, the court held that the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(1), preempted the plaintiff's state law claims. The court found significant that, in passing the ADA, Congress retained 49 U.S.C. § 44902(b), which the court explained, "grant[s] broad discretion to airlines in making safety-related boarding decisions." *Id.* at 257-58. The court also observed that federal law generally, and §
(continued...)

In this case, the facts in the pleadings alone do not show that no reasonable jury could conclude that Delta employee Moloney's actions were capricious or arbitrary. See Cordero, 681 F.2d at 672. As the court must assume Plaintiff never stated the word "bomb" in her conversation with Moloney, there are no facts in the pleadings which reasonably indicate that Plaintiff posed a security threat to the airline and thus that Moloney had a reasonable basis for a good faith belief that Plaintiff presented a security risk under the Williams test. Delta's motion to dismiss on § 44902(b) grounds, therefore, must be denied.

## CONCLUSION

Whether Plaintiff Hansen was "embarking" on an international flight as defined by Article 17 of the Warsaw Convention, and whether Delta's actions were protected by 49 U.S.C. §§ 44941 and 44902(b), are fact-based determinations. At this stage of the proceedings, in which Plaintiff has the benefit of every favorable inference that can be drawn from the facts she has alleged, the motion to dismiss on these bases must be denied. The court cautions, however, that if discovery establishes that Plaintiff was in line waiting to board her flight and under Delta's control at the time of her arrest, or that she used the word "terrorist" in any imaginably threatening way, the court expects that Delta will prevail on a motion for summary judgment.

ENTER:

Dated: March 17, 2004

REBECCA R. PALLMEYER
United States District Judge

---

[10](...continued)
44902(b) specifically, "appropriately grants airlines latitude in making decisions necessary to safeguard passengers from potential security threats." Id. at 258. As the Smith court did not base its decision on § 44902(b), its relevance to the case before this court is limited. In any event, as the cases examined supra explain, airlines' discretion regarding safety issues, while broad, is not absolute.